UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Case No.: 3:19-cr-220 |
| v. | ) Judge Varlan |
| | ) |
| BRYAN CORNELIUS | ) |

**Sentencing Memorandum of the United States**

The United States respectfully offers this Sentencing Memorandum to explain its position regarding the appropriate sentence in this case. The Revised Presentence Investigation Report (PSR)( Doc. 817) lists defendant's advisory Guidelines range as life plus 15 years based on an offense level 43[1] and a criminal history category of V. PSR ¶ 101.

The United States believes the factors set forth in 18 U.S.C. § 3553(a), demonstrate that the Court should impose a life sentence plus 15 years, broken down as follows:

- Count One: **life**
- Count Two: **life**
- Count Three: **40 years**
- Count Four: **20 years**
- Count Five: **20 years**
- Count Six: **20 years**
- Count Seven: **5 years, consecutive to any other term of imprisonment**
- Count Eight: **10 years, consecutive to any other term of imprisonment**
- Count Twelve: **life**
- Count Thirteen: **life**

---

[1] Defendant's actual offense level is higher than 43. As calculated by the PSR, defendant's offense level is 48 (PSR ¶ 64). However, "in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43." PSR ¶ 67. Accordingly, the calculated Guidelines range *underrepresents* the nature and severity of defendant's offenses.

1

**Legal Standard**

"The preponderance of the evidence standard applies to contested facts in sentencing proceedings." *United States v. Silverman*, 889 F.2d 1531, 1535 (6th Cir. 1989) (citing *United States v. Urrego-Linares,* 879 F.2d 1234, 1238 (4th Cir. 1989); *United States v. Lee*, 818 F.2d 1052 (2d Cir. 1987)., At sentencing, "[t]he government bears the burden to establish enhancement factors, where contested." The government also bears this same burden to establish enhancement factors and the district court applies this standard in its factual determinations. *Id*. Federal Rule of Criminal Procedure 32 also requires the district court to make such factual findings for sentencing.

For sentencing matters that are undisputed, a district court "may accept any undisputed portion of the presentence report as a finding of fact." Fed. R. Crim. P. 32(i)(3)(A). For matters that are in dispute, the court "must – rule on the dispute or determine that a ruling is unnecessary." Fed. R. Crim. P. 32(i)(3)(B).

At sentencing, a defendant must "produce some evidence that calls the reliability or correctness of the alleged facts into question." *United States v. Cover*, 800 F.3d 275, 278 (6th Cir. 2015) (per curiam) (quoting *United States v. Lang*, 333 F.3d 678, 681 (6th Cir. 2003)). This must be beyond a bare denial. "A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth…he must produce *some evidence* that calls the reliability or correctness of the alleged facts into question." *United States v. Adkins*, 729 F.3d 559, 570 (6th Cir. 2013) (quoting *Lang*, 333 F.3d at 681).

**Relevant Background**

Defendant was a violent member of the Gangster Disciples, which have been the source of serious, violent crime in Knoxville for several years, including homicides, assaults, robberies,

2

carjackings, and high-volume, armed drug trafficking. After an approximate one-week trial in April 2022, the jury convicted defendant with 10 counts of various crimes. Defendant was convicted of two firearms crimes including discharging a firearm in furtherance of a drug trafficking crime, conspiring to commit money laundering, methamphetamine distribution, and conspiring to distribute 50 grams or more of actual methamphetamine, as well as distribution quantities of heroin, fentanyl, and marijuana. The trial included wiretaps, cooperating witness testimony, and seized drugs, guns, and drug money.

## PSR

### *Guideline Range*

The PSR accurately summarizes defendant's conduct in paragraphs 21-53. The PSR also correctly states that the Guidelines imprisonment range is life plus 15 years. PSR ¶ 101.

The properly calculated Guideline range in this case is life imprisonment plus 15 years, which is the statutorily mandated consecutive penalty for the two § 924(c) offenses.

Additionally, because the Guideline ranges for offenders with an offense level of 43 or greater (defendant's offense level was 48) is life imprisonment, *see* U.S.S.G. §5A. The Court should impose the properly calculated Guidelines range of life and not impose a below-Guidelines sentence.

### *Drug Quantity: 4.7 kilograms or more of actual methamphetamine*

The PSR correctly and conservatively calculated the estimated drug quantities, including the actual methamphetamine – at least 4.7 kilograms – attributable to defendant.

"A drug quantity need only be established by a preponderance of the evidence, and an estimate will suffice . . . ." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). "[T]estimonial evidence from a coconspirator may be sufficient to determine the amount

of drugs for which another coconspirator should be held accountable." *United States v. Swanberg*, 370 F.3d 622, 625 (6th Cir. 2004); *see also United States v. Cohen*, 515 F. App'x 405, 413 (6th Cir. 2013) (recognizing that a district court may base its fact-finding on the prior statements of a coconspirator "so long as it is not obvious that the statements were untruthful."). In estimating the amount of drugs, district courts may consider the drug quantities in which the defendant was directly involved and those reasonably foreseeable to him. *United States v. Ledezma*, 26 F.3d 636, 646 (6th Cir. 1994). However, the drug quantity estimate must "err[] on the side of caution and likely underestimate[] the quantity of drugs actually attributable to the defendant." *Anderson*, 526 F.3d at 326.

For the drug trafficking conspiracy in Count One of the Superseding Indictment, a quantity of at least 4.7 kilograms of actual methamphetamine is an accurate, conservative estimate attributable to defendant. This conservative estimate is based on trial testimony, wiretap calls, and seized methamphetamine. For example, during lengthy direct and cross-examinations at trial, coconspirator Dana Littlejohn, Jr. (Littlejohn) testified about receiving packages of methamphetamine and marijuana in the mail and selling the methamphetamine and marijuana to defendant, who would pay cash for the drugs. R. 748, Trial Tr. at pageID 5865. Littlejohn further detailed quantity amounts throughout his testimony. For example, Littlejohn interpreted several wiretap calls and testified to quantities of ice methamphetamine, testifying that he typically sold 16 ounces of ice methamphetamine to the defendant at a time. R. 748, Trial Tr. at pageID 5871. Far from being "untruthful," *Cohen* 515 F. App'x at 413, Littlejohn's trial testimony was corroborated by other trial testimony, seized methamphetamine and methamphetamine money, and wiretap calls intercepted during the summer of 2019.

4

Further, William Woody (Woody) testified that he bought heroin and methamphetamine from the defendant. R. 746, Trial Tr. at pageID 5551. Woody testified that he purchased a half ounce of heroin from the defendant once or twice a week until the defendant was arrested. R. 746, Trial Tr. at pageID 5566. Woody also testified that over the course of knowing the defendant, he purchased at least a kilogram of methamphetamine from the defendant. R. 746, Trial Tr. at pageID 5567. Woody's testimony was cooberated by over 120 recordings of court-authorized wiretaps. Similarly, Dexter Moulden testified he purchased between 10 to 20 ounces of ice methamphetamine from the defendant. R. 748, Trial Tr. at pageID 5807.

Accordingly, the PSR's calculation of 4.76 kilograms of actual methamphetamine, 1.6 kilograms of heroin/fentanyl, and 600 pounds of marijuana, which equates to 95,370 kilograms of converted drug weight, which equates to a Base Offense Level of 38 is accurate. PSR ¶ 49 – 59. The defendant also maintained a dwelling for the purposes of distributing controlled substances per U.S.S.G. § 2D1.1(b)(12), which increases the defendant's base offense level to 40. PSR ¶ 59.

<u>*Money Laundering Enhancement*</u>

Because defendant was "convicted of under 18 U.S.C. §1956," the PSR correctly includes two additional levels. PSR ¶ 60.

<u>*Adjustment for Obstruction of Justice*</u>

Defendant merits the two-point enhancement for willfully obstructing, impeding or attempting to obstruct or impede justice making credible threats of violence, pursuant to U.S.S.G. §3C1.1. PSR ¶ 63.

The evidence at trial showed that the defendant threated co-defendant Woody. Woody testified that he was "scared for my life from the repercussions of doing this" and that the defendant "said he was going to get my family if I did this." R. 746, Trial Tr. at pageID 5549. Defendant's credible threats to William Woody merit this two-point enhancement.

*Maintaining a Premises for the Purpose of Drug Distribution Enhancement*

This enhancement, pursuant to U.S.S.G. §2D1.1(b)(12), *see also* PSR ¶59, applies to the residences located at 3700 Gunnison Way and 6632 Wachese Lane. R. 745, Trial Tr. at pageID 5131.

Trial testimony from FBI Task Force Officer Kristopher Mynatt (TFO Mynatt) revealed that these residences were used primarily, if not exclusively, as places to receive and store drugs and guns. *See, e.g.,* GE 2 and 69. TFO Mynatt testified that defendant and co-defendant Gage Whittenberg (Whittenberg) were partners in leasing/renting drug houses and would often discuss paying rent at one location or another. R. 745, Trial Tr. at pageID 5135. Wiretap calls and testimony from TFO Mynatt showed that defendant and co-defendant Whittenberg often discussed taking guns and drugs from one location to another. R. 745, Trial Tr. at pageID 5138-5140. Search warrant photographs admitted during trial (GE 2) showed an extensive camera system inside the house at 3700 Gunnison Way and TFO Mynatt testified that drug dealers often used camera systems to protect themselves. R. 744, Trial Tr. at pageID 5059-508.

Defendant expressed his control and use of these residences in recorded phone calls. *See*, GE 113, 114, 115, 158, 191, 192

The evidence at trial revealed that, defendant regularly maintained the Gunnison residence and was photographed there (*See*, GE 34), several coconspirators, including defendant, knowingly and corporately used and maintained the residence primarily as a place to receive and

6

store drugs. *See United States v. Hagan*, 766 F. App'x 356, 359-60 (6th Cir. 2019) (drug distribution need not be the sole purpose for which the premises was maintained, as long as "one of defendant's primary or principal uses for the residence is the distribution of drugs, the enhancement applies").

Even without the direct evidence of defendant's admitted control of and direction over these residences within the drug trafficking conspiracy, the residences' primary use as drug houses by his coconspirators, including Whittenberg, constitutes relevant conduct reasonably foreseeable to defendant. U.S.S.G. §1B1.3(a)(1)(B)(iii). While acknowledging the existence of different viewpoints, the Sixth Circuit affirmed application of this enhancement in a case where one of the defendant's coconspirators, and not the defendant himself, personally maintained the drug house. *United States v. Austin*, 797 F. App'x 233, 245 (6th Cir. 2019). *Compare United States v. Miller*, 698 F.3d 699, 706 (8th Cir. 2012) ("We assume that §2D1.1(b)(12), like the 21 U.S.C. §856(a)(1) offense that it parallels, requires proof that the specific defendant being sentenced maintained the premises 'for the purpose of' drug manufacture or distribution.") *with United States v. Holmes*, 767 F. App'x 831, 839 (11th Cir. 2019) ("Nothing in §2D1.1(b)(12) prohibits a sentencing court from imposing the premises enhancement based on the jointly undertaken criminal activity of coconspirators.").

Accordingly, evidence of defendant's actual use of and direction and control over the Gunnison Way residence as it related primarily to drug trafficking, or the reasonable foreseeability of his coconspirator's drug trafficking-related control over the residence, both support application of this enhancement to defendant's sentence.

## Leader/Organizer Enhancement

Defendant merits the four-point aggravating role enhancement, pursuant to U.S.S.G. §3B1.1(a), because defendant was an "organizer or leader of a criminal activity that involved five or more participants." PSR ¶ 62. The record, evidence, testimony at trial, and defendant's PSR, confirms that there were five or more participants in the drug conspiracies and five or more participants in the money laundering conspiracies. That same factual record also demonstrates that defendant was one of the key leaders of the drug and money laundering conspiracies because he "exercised decision-making authority, recruited accomplices, received a larger share of the profits, was instrumental in the planning phase of the criminal venture, or exercised control or authority over at least one accomplice." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citing *United States v. Lalonde*, 509 F.3d 750, 765-66 (6th Cir. 2007)); *see also* U.S.S.G. §3B1.1, cmt. n.4. A defendant can still qualify for a leadership enhancement even though he does not meet every factor. *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006).

Defendant exercised decision-making and directed other key aspects of these conspiracies, including the acquisition and retention of firearms, the acquisition of large quantities of drugs, collection of drug debts, and directing subordinates on other drug trafficking activities and security. *See, e.g.,* GE 125, 127, 128, 129, 130, 131, 132, 133.

In all of the ways described above, defendant used his authority to "organiz[e] key features of the conspiracy and direct[] the actions of his coconspirators." *United States v. Sierra-Villegas*, 774 F.3d 1093, 1101 (6th Cir. 2014). Accordingly, defendant merits the four-point leader/organizer enhancement.

### Todd Lundy Shootings and Violence

The danger that defendant, his co-defendants, and their unindicted co-conspirators pose to the public cannot be overstated. A survey of the evidence contained in the record of this case reveals the very real threat to the public that the defendant has caused and will continue to cause if he was to be released from prison. Defendant's PSR and other evidence provides a glimpse of the nature of the threat he and several of his co-defendant's pose to the public.

Wiretap calls played at trial revealed that defendant, along with two other individuals, shot Todd Lundy (Lundy) at the Stop-N-Go after an argument. *See*, GE 141, 142, 143, 144, 145, 151, and 152. In GE 151, defendant was excited and said "yes" when he found out that Lundy got hit during the shooting. In GE 152, defendant called an unknown male and excitedly told him that Lundy got hit and "he in the hospital trying to get out." In that same call, defendant stated that "everybody say that they knew it was me…I don't give a fuck…boy we is the big 3 out here…". Littlejohn cooberated these calls with his testimony and testified about going with defendant to shoot the person that robbed their friend "Tune." R. 748, Trial Tr. at pageID 5901. Todd Lundy testified that he was supposed to meet defendant at the Stop-N-Go the day he was shot. R. 748, Trial Tr. at pageID 5735-5736.

Over the course of the investigation and while law enforcement was up on a wiretap of defendant's phone, a friend of the defendant, Tyrese Wyrick (Wyrick) was shot and killed. Wiretap calls in the days after Wyrick's murder revealed that defendant, co-defendant Whittenberg, and other Gangster Disciple members were trying to figure out who murdered Wyrick. Defendant and co-defendant Whittenberg had narrowed it down to two or three individuals and defendant made the comment that if they couldn't figure out exactly who killed Wyrick, they were just going to "kill them all." This comment forced the FBI to take down the

9

wire of defendant's phone and quickly arrest defendant and co-defendant Whittenberg to protect the public.

The United States offers this additional evidence of gang-related violence to highlight the unique dangers that defendant and his co-defendants pose to the public, as further argued below. *See also*, 18 U.S.C. §3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

**Discussion**

As the Court is well aware, the first step in sentencing a defendant post-*Booker* is to correctly calculate the Guidelines range and to recognize the advisory nature of that range. *Gall v. United States*, 552 U.S. 38, 51 (2007). Second, a sentencing court post-*Booker* is required to impose a sentence that is "sufficient but not greater than necessary," 18 U.S.C. § 3553(a), to "comport with the goals of criminal justice." *United States v. Denny*, 653 F.3d 415, 420 (6th Cir. 2011). To assist the Court in that task, § 3553(a) lists factors that should be considered before the imposition of sentence. *Id*.

More specifically, § 3553(a) requires consideration of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). It also requires consideration of the "need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," as well as the need to "afford adequate deterrence to criminal conduct," the need to "protect the public from further crimes of the defendant," and the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." 18 U.S.C. § 3553(a)(2)(A)-(D). In this case, the United States asserts that consideration of those factors should lead the

Court to conclude that a sentence of life plus 120-months, broken down by count, as discussed on the first page of this sentencing memorandum, comports with the goals of sentencing and the §3553(a) factors.

   A. **Nature and circumstances of the offense and history and characteristics of the defendant**

Looking to the § 3553(a) factors, and as summarized in the defendant's PSR and discussed at length above, the defendant led other co-conspirators, in distributing controlled substances, money laundering, and firearms crimes. Defendant is 32 and yet his criminal history is significant. For example, at age 18 defendant became a convicted felon after committing theft and aggravated burglary in the Criminal Court of Knox County, Tennessee, where he was sentenced to three years imprisonment. At age 20, defendant was convicted of being a felon in possession of a firearm in the United States District Court for the Eastern District of Tennessee, and was sentenced to 30 months imprisonment. Also, defendant has made credible threats of violence in this case, including threatening William Woody, as discussed above.

   B. **Need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to promote adequate deterrence, and protect the public**

Defendant is an unrepentant, violent, drug trafficking member of the Gangster Disciples, a nationwide criminal organization known for committing serious crimes wherever members, like defendant and his co-defendants, are present. *See* R. 744, Trial Tr. at page ID 5073. Defendant used his influence and disdain for the law to bring significant quantities of dangerous drugs – and the attendant crime that accompanies this level of drug trafficking – into this district. In doing so, defendant possessed firearms in furtherance of his crimes. Defendant's proven and ever-escalating criminal conduct, coupled with his coarse, cold attitude and his expressed

willingness to kill, reveal no sign of remorse or desire to live a law-abiding life. Thus, in order to promote respect for the law, this Court must impose a significant sentence.

The United States asserts that a significant sentence – indeed, imposition of a Guidelines sentence of life plus 15 years – is especially needed to provide specific and general deterrence, and, perhaps most importantly, to protect the public from the inevitable and serious crimes that this defendant will commit if he is ever released from prison. A life sentence plus 15 years will provide adequate deterrence as to defendant specifically, as well as deterrence generally to other similarly situated people who, like defendant, are gang members who choose to commit crimes and victimize the community instead of obtaining an education and working a legitimate job.

## Conclusion

A Guidelines sentence of life plus 15 years reflects the seriousness of the offenses, promotes respect for the law, provides just punishment, promotes adequate deterrence, and, critically, protects the public from this defendant.

Respectfully submitted,

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

By: *s/ Cynthia F. Davidson*
Cynthia F. Davidson (TN Bar # 16099)
Assistant United States Attorney
800 Market Street, Suite 211
Knoxville, Tennessee 37902
865.545.4167
cynthia.davidson@usdoj.gov
